[Cite as *Columbus v. C.G.*, 2021-Ohio-71.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

City of Columbus, :

     Plaintiff-Appellee, :

                                  No. 19AP-121

v. : (M.C. No. 18CRB22844)

C.G., : (REGULAR CALENDAR)

     Defendant-Appellant. :

D E C I S I O N

Rendered on January 14, 2021

**On brief:** *Zachary M. Klein*, City Attorney; *Bill R. Hedrick*, City Prosecutor, and *Orly Ahroni*, for appellee. **Argued:** *Orly Ahroni.*

**On brief:** *Yeura Venters*, Public Defender, and *Timothy E. Pierce*, for appellant. **Argued:** *Timothy E. Pierce.*

APPEAL from the Franklin County Municipal Court

KLATT, J.

{¶ 1} Defendant-appellant, C.G.[1], appeals from a judgment of the Franklin County Municipal Court finding him guilty, following a bench trial, of assault and domestic violence. For the following reasons, we affirm.

{¶ 2} On November 7, 2018, appellant was charged with assault in violation of R.C. 2903.13(A) and domestic violence in violation of R.C. 2919.25(A), both first-degree misdemeanors. Each of the counts contained similar "to wit" language stating that

---

[1] The names of individuals other than law enforcement officers have been initialized to protect the identity of the victim.

appellant committed the conduct at issue by grabbing the victim's throat in an attempt to strangle the victim, punching the victim in the head, and repeatedly kicking the victim's body. Appellant entered a not guilty plea to the charges, waived his right to a jury trial, and elected to be tried by the court.

{¶ 3} According to the city's evidence, the victim in this case is S.S., appellant's live-in girlfriend, and the mother of his two young children. T.W.-M. ("W.-M.") is S.S.'s older sister. On November 7, 2018, W.-M. and her family resided on South Ashburton Road in Columbus. S.S. lived with appellant and their two young children on Carpenter Ridge Drive in Columbus. According to W.-M., it is a 25-to-30 minute drive from S.S.'s residence to hers.

{¶ 4} In the early morning hours of November 7, 2018, S.S. arrived with her children and dog at W.-M.'s home; S.S. was crying and "visibly upset." (Jan. 30, 2019 Tr. at 26.) She had bruises on her face, chin, arms, side, and left shoulder and "[h]er hair was all over her head." *Id.* at 29. W.-M. described S.S.'s demeanor as "very out of it," "very nervous," and "pacing back and forth." *Id.* at 26-27. W.-M. surmised that S.S.'s behavior was the result of a "violent incident" that had occurred "a couple hours" before S.S.'s arrival at her home. *Id.* at 27.

{¶ 5} S.S. told W.-M. that appellant had taken her cell phone and questioned her about her alleged communications with another man. Appellant then "started to punch on her and hit her." *Id.* at 30. S.S. attempted to fend appellant off with her arms while trying to protect her face. She eventually fell down; appellant "proceeded to kick her in her side, on her left side, and in her - - her private area." *Id.* at 30-31. S.S. was screaming and trying to keep appellant from striking her in the face. Appellant then "grabbed her by her hair, drug her and threw her on the bed; [he] pulled her hair, with one hand, very hard to one side." *Id.* at 31. Appellant then punched S.S. repeatedly in the back of the head while simultaneously pulling her hair. S.S. demonstrated appellant's actions and showed W.-M. where her hair had been "pulled out." *Id.* at 32. S.S. was "still kind of pacing" and was "very upset," "very frantic," and "kept crying" while reporting and demonstrating what appellant had done to her. *Id.* Appellant eventually stopped the abuse. She waited until he fell asleep to leave the house with her children and dog and drive to W.-M.'s home. After S.S. calmed down, W.-M. called the police.

{¶ 6}   W.-M. identified a photograph taken by the police which depicts a bruise on the right side of S.S.'s face (City's Ex. F), as well as photographs she had taken the morning after the incident which depict bruises on S.S.'s shoulders and upper right arm.  (City's Ex. B, C, and D.)  W.-M. averred that she waited until morning to take the photographs on the advice of the police, who told her the bruises on S.S.'s face and body would darken after a few hours.  W.-M. also identified appellant's voice on an audio recording of a 911 call made by appellant reporting the altercation with S.S.  In that call, appellant asserted that he merely attempted to restrain S.S. after she attacked him and that he wanted to establish his version of the events to forestall any future false accusations made against him.  (City's Ex. A.)

{¶ 7}   On cross-examination, W.-M. reiterated that the incident between S.S. and appellant occurred "a couple of hours prior to [S.S.'s] arrival" and that the drive-time from S.S.'s house to her house was approximately 30 minutes.  (Tr. at 39.)  W.-M. acknowledged that S.S. had no trouble communicating what had happened to her and provided "pretty detailed information" about the incident.  *Id.* at 44.  She further acknowledged that she did not have a very high opinion of appellant, had met him only twice, and had last seen him in 2015.  When questioned about her assumption, upon S.S.'s arrival at her home, that S.S. had been involved in an altercation with appellant, W.-M. explained that S.S. had come to her home every few months with bruises that had been inflicted by appellant; the most recent incident was in May 2018.  She conceded that she had never called the police prior to the instant incident; however, she had encouraged S.S. to do so.

{¶ 8}   Columbus Police Officer Ryan Kaethow testified that he and Officer Braskie were dispatched to the Ashburton address on a domestic violence call.  According to Officer Kaethow, S.S. "was disheveled. She seemed frightened, terrified, * * * like she was reluctant to call us at the request [of] her sister.  * * * She was afraid, maybe, of backlash that might occur."  *Id.* at 63-64.  He further averred that S.S.'s "hair was disheveled" and she had "marks on her neck" and her thumb.  *Id.* at 64.  Based upon their observations and S.S.'s statements recounting the incident, the officers filed domestic violence and assault charges against appellant.  Officer Kaethow did not testify as to the content of S.S.'s statements, and the U-10 arrest report he prepared in connection with her statements was not admitted into

evidence. On cross-examination, Officer Kaethow acknowledged that he did not ask S.S. whether she had assaulted appellant.

{¶ 9} Appellant testified that on November 7, 2018, he drove home from a property he owned on the east side of Columbus. Because he was "bottled up" about issues regarding S.S.'s alleged infidelity and wanted to avoid an argument in the presence of their children, appellant parked in front of the house, waited several minutes, and then called S.S. from the car. *Id.* at 73. S.S. became angry, cursed at appellant, and hung up. After a few minutes, appellant entered the house and attempted to discuss the issue with S.S.; however, S.S. became "hysterical." *Id.* at 77. When S.S. questioned appellant about his prior infidelity, he asked if her actions were based on revenge. S.S. then punched appellant "dead in my face, in the center of my face." *Id.* at 78. After appellant backed up, S.S. ran toward him and began scratching his face. Appellant grabbed her arms and pushed her up against the wall. S.S. then spit in his face; he pushed her again and she landed on their bed.

{¶ 10} Appellant told S.S. they should stop arguing and walked away. He then fell asleep in the children's bedroom. When he woke up, he realized that S.S. and the children were gone. He texted and called her, but she did not respond. He then called the police to report the incident. Appellant testified that due to past events which resulted in the police being called on him, he "wanted to make sure [the police] had it on record * * * that we had an altercation and exactly the [specifics] of what happened * * * so that I wouldn't go to jail * * * for something that I didn't do." *Id.* at 83.

{¶ 11} On cross-examination, appellant admitted that he told the 911 operator that he was not afraid for his safety. He reiterated as much at trial, adding that he was not afraid because S.S. is a female. When questioned about the injuries allegedly inflicted by S.S., appellant stated that photographs of his injuries had been taken at his arraignment. However, he conceded that those photographs would not be offered at trial. Appellant denied that he called the police in order to preempt S.S.'s likely reporting of the incident.

{¶ 12} On the evidence before it, the trial court found appellant guilty of both assault and domestic violence. The court proceeded immediately to sentencing, and pursuant to the city's election, sentenced appellant on the domestic violence count. The court imposed the maximum sentence of 180 days incarceration and credited appellant with two days' time served. The court ordered the sentence to be served "forthwith" and denied appellant's

request to stay the sentence pending appeal. (Tr. at 117.) The trial court memorialized its judgment and sentence on January 30, 2019.

{¶ 13} In a timely appeal, appellant sets forth the following four assignments of error:

> [I]. The Appellant's right to a fair trial was undermined when the lower court violated his right to confrontation under Article I, Section 10 of the Ohio Constitution when it allowed third party witnesses to submit hearsay remarks made to them by non-testifying hearsay declarant S.S. Moreover, the City never demonstrated that S.S. was unavailable to be present and testify at trial.
>
> [II]. The lower court erred when it admitted the hearsay statements of absent witness S.S. The admission of these statements violated Evid.R. 802 as well as Appellant's right to a fair trial under Article I, Sections 1, 10, and 16 of the Ohio Constitution and the Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.
>
> [III]. The lower court undermined Appellant's right to present a defense when it denied his request for additional time to secure the presence of S.S. to testify on his behalf in violation of Article I, Sections 1, 10 and 16 of the Ohio Constitution and Fifth, Sixth, and Fourteenth Amendments of the United States Constitution.
>
> [IV]. The lower court's guilty finding was not supported by the manifest weight of the evidence.

{¶ 14} Because appellant's first, second, and third assignments of error allege trial court error related to S.S.'s failure to testify and the admission of her out-of-court statements through the testimony of W.-M., we will address them together. This approach is particularly appropriate here given that the parties' arguments at trial and the trial court's analysis of those arguments were interrelated. Further, at oral argument, counsel for appellant acknowledged the interconnectedness of the arguments.

{¶ 15} We begin with a detailed account of the facts, discussions, and arguments pertaining to these three assignments of error. Trial was originally set for November 29, 2018. A subpoena was issued for S.S.'s appearance on November 14, 2018. Following a pretrial hearing on November 29, 2018, trial was rescheduled for December 13, 2018. The entry memorializing the reassignment does not divulge a reason for the change. A

subpoena for S.S.'s appearance at the December 13, 2018 trial was issued on November 30, 2018. On December 13, 2018, the court filed an entry continuing the trial to January 29, 2019, "at request of [the city]." (Dec. 13, 2018 Entry at 1.) A subpoena was issued for S.S.'s appearance at the January 29, 2019 trial on December 14, 2018.

{¶ 16} Trial commenced at 3:50 p.m. on January 29, 2019. Appellant was represented by counsel from the Franklin County Public Defender's Office. During a somewhat heated exchange with the trial court regarding his desire to obtain private counsel, appellant averred, "I'm going to file an appeal if I get found guilty. * * * I'm going to proceed. * * * I have been here four times. * * * You all need the victim here; that's who needs to be here testifying against me. There was nobody there but me and the victim and my two kids." (Jan. 29, 2019 Tr. at 3-4.)

{¶ 17} The trial court explained that it was the city's prerogative to move forward with the case if it believed it had the proper witnesses and evidence to do so, and that the court would rule on the admissibility of that evidence, if necessary, at the appropriate time. The court averred that if the city failed to present witnesses and evidence at trial, the city would have to dismiss the case.

{¶ 18} Following brief opening statements, the trial court instructed the parties that trial would commence at 8:30 a.m. the next day. The court warned that it would issue a warrant for appellant's arrest if he did not appear and would dismiss the case if the city's witnesses did not appear. Noting the possibility that inclement weather might result in closure of the courthouse the next day, the trial court advised that if that were the case, trial would be continued on a day-to-day basis until the courthouse reopened. The court then adjourned for the evening.

{¶ 19} Trial resumed the next morning, January 30, 2019. W.-M. testified as set forth above. Defense counsel objected on hearsay grounds to the prosecutor's questions about what S.S. told her. The prosecutor argued that S.S.'s statements to W.-M. were excited utterances admissible under Evid.R. 803(2). The trial court overruled the objection.

{¶ 20} After W.-M. completed her testimony, defense counsel renewed the objection to the hearsay portion of that testimony. Defense counsel argued that the testimony violated appellant's right to confrontation under the Sixth Amendment to the United States

Constitution and Ohio Constitution, Article I, Section 10, and that the city had failed to demonstrate S.S.'s unavailability to testify. To that end, defense counsel asserted that S.S. had recently contacted him and reported that she was available to testify. He further argued that the testimony was not admissible under the Ohio Rules of Evidence, as S.S.'s statements to W.-M. did not qualify as excited utterances under Evid.R. 803(2). The prosecutor responded that the testimony did not violate the confrontation clauses of the federal or state constitutions and that S.S.'s statements qualified as excited utterances under Evid.R. 803(2). The trial court overruled the objection, finding that the testimony "does fit the hearsay exception for an excited utterance." (Jan. 30, 2019 Tr. at 52.)

{¶ 21} Following a short recess, defense counsel informed the court that he had just been in contact with S.S., and that he had "very good reason to believe [she] will offer further exculpating testimony and also be able to refute a lot of what you just heard." *Id.* at 52-53. Counsel averred that S.S. was unable to make it to court that day because she lived in Cleveland and was concerned about driving to Columbus in inclement weather. Counsel added that S.S. "would be able and willing to be here in the very near future with adequate time to prep for that road trip." *Id.* at 53.

{¶ 22} The trial court asked the prosecutor if S.S. was a "subpoenaed witness of the State." *Id.* at 53. The prosecutor replied, "That is correct." *Id.* The trial court then inquired, "[a]nd she is refusing to come based on your contact with her"? *Id.* In response, the prosecutor averred that "we haven't had contact recent to this court date. We have had contact once since the case began, and we were told that - - Well, we were told something that, I guess, I would prefer not to share on the record." *Id.* Defense counsel then interjected that he had been made aware that W.-M. would be testifying only the day before, as she had previously not been subpoenaed; accordingly, he had no advance knowledge that S.S. would need to testify in rebuttal. In response, the prosecutor noted that defense counsel did not file a request for discovery as a matter of trial strategy; had he done so, the prosecutor would have been obliged to promptly identify W.-M. as a witness when he became aware of her existence two days before she testified. Defense counsel argued that procuring S.S.'s attendance as a rebuttal witness with only two days' notice "would have been a very close call." *Id.* at 55.

{¶ 23} The trial court disagreed with defense counsel, noting that S.S. lived less than two hours from Columbus. The court further noted that defense counsel's strategic decision not to request discovery "might not have worked out the best for you" and that S.S. had chosen to ignore the city's subpoena. *Id.* at 56. To that point, the court averred, "[y]ou now want me to delay the trial because what at one point was a benefit to you, in that the witness[/]victim was ignoring the subpoena, that was beneficial to you. You would have had no problem with that until the State calls this witness that - - Now, all of a sudden it's beneficial to you and for the victim, at least in your opinion, for her to come in and testify. She * * * [has] been on notice of today's court date. She has chosen to ignore the subpoena." *Id.*

{¶ 24} The court denied the request for a continuance, stating, "[i]f we reach a point in the trial where you don't have any further witnesses to call and she's not here, then you're going to be forced to rest your case. Like I said, I'll put it on the record. It's cold outside, but it is not snowing. We are not under any sort of a blizzard-like condition. It's just cold. A car operates just fine in the cold. * * * If it's truly her desire to come and testify, she's had weeks of notice to prepare to be here. She was actually supposed to be here yesterday. She has chosen to ignore that * * *." *Id.* at 56-57. The court further noted that it would have held the city to the same standard: "[i]f she was the only witness the State had and they were unable to proceed, you would be standing on your head arguing this case needs to be dismissed. She's not here. She's ignored the subpoena. I'm going to hold you to the same standard." *Id.* at 57. The court then advised defense counsel to call S.S. and tell her she needed to be in court that afternoon.

{¶ 25} Following appellant's testimony, defense counsel renewed the request for additional time to secure S.S.'s appearance. Counsel averred that S.S. told him she could not make it to court that day because her vehicle was not reliable enough to make the trip from Cleveland with her children given the sub-zero windchill temperatures. The court denied the request, stating "if you told me that she could be here today, I would wait. It's only 11:15. There would be plenty of time for her to drive down here, and we could resume this afternoon. * * * If she doesn't feel her vehicle is reliable to come down today * * * I don't see the weather necessarily being an issue there. I mean, the car can make it or it can't. I don't see that's something that's going to be cured." *Id.* at 95.

{¶ 26} The court further stated, "[a]nd really, primarily, this was a witness that was subpoenaed by the State. This was a witness that was supposed to be present yesterday. This witness did not feel that there was any reason for her to cooperate with the State's subpoena and come to court at that time, and * * * nothing * * * [r]eally seems to have changed. * * * You want to say * * * that she can be here at some other time, but you're not telling me when. There doesn't seem to be any indicator that there's any real truth to that. * * * And what's more frustrating is * * * she was subpoenaed to be here. She declined to cooperate and to come down and * * * appear on a lawfully-served subpoena. And * * * [y]esterday you were asking me to dismiss the case because the victim was not here. Today you're asking me to continue the case because you want to get the victim here, and she's changed her mind." *Id.* at 95-96.

{¶ 27} Defense counsel argued that the subpoena was sent to S.S.'s former address on Carpenter Avenue, but she now lived in Cleveland. The court responded, "the State's ability to subpoena the witness is dependent on the witness providing the State with an address that they can receive a subpoena at. The State doesn't control the movement of a witness. If a witness provides an address, the State can merely send the subpoena to the address provided by the witness. If the witness has moved, that's not [the State's] fault." *Id.* at 96. The court further averred, "[y]ou've presented zero evidence to indicate that this witness was not aware of the subpoena. It seems to me that based on * * * your statements * * * that this witness knew she was supposed to be here yesterday and simply refused to cooperate with the State and come down to court. Because at that time, she believed that - - I'm assuming that by doing so, that this case would end up being dismissed. That not being the case now, something has happened overnight where, by your own statements to the court earlier, the prosecuting witness [S.S.] made contact with the defendant, which then in turn resulted in you making contact with this witness. And now all of a sudden 'I want to come down, and I have testimony that could be exculpatory. But I don't want to come down today because the weather is bad and my car is not reliable.' It's wintertime in Ohio. These aren't things that are going to change. Her vehicle isn't going to miraculously fix itself if it's not reliable. So no." *Id.* at 96-97.

{¶ 28} For ease of analysis, we first consider appellant's second assignment of error, under which he argues that the trial court erred in admitting S.S.'s statements through the

testimony of W.-M. pursuant to Evid.R. 803(2), the hearsay exception for excited utterances. Evidentiary rulings concerning the admission of hearsay testimony under Evid.R. 803(2) are reviewed for an abuse of discretion. *State v. McClain*, 10th Dist. No. 13AP-347, 2014-Ohio-93, ¶ 27, citing *State v. Sage*, 31 Ohio St.3d 173, 180 (1987). A trial court abuses its discretion when its decision is arbitrary, unreasonable, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Abuse-of-discretion review is deferential and does not permit an appellate court to simply substitute its judgment for that of the trial court." *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, ¶ 34, citing *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, ¶ 14. In addition, "appellate courts 'give further deference to a judge's [admission of evidence] decision when the evidence is introduced in a bench trial.' " *State v. Sheeders*, 2d Dist. No. 2019-CA-2, 2019-Ohio-3120, ¶ 17, quoting *Stark Cty. Park Dist. v. Dickerhoof*, 5th Dist. No. 2017CA00231, 2018-Ohio-4319, ¶ 49.

{¶ 29} "Hearsay" is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). " 'Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence.' " *State v. Canada*, 10th Dist. No. 14AP-523, 2015-Ohio-2167, ¶ 27, quoting *State v. L.E.F.*, 10th Dist. No. 13AP-1042, 2014-Ohio-4585, ¶ 5. Evid.R. 803(2) sets forth an exception to the hearsay rule if the out-of-court statement constituted an "[e]xcited utterance," defined as a "statement relating to a startling event or condition made while the declarant [is] under the stress of excitement caused by the event or condition." "The excited utterance exception to the hearsay rule exists because excited utterances are the product of reactive rather than reflective thinking and, thus, are believed inherently reliable." *State v. Ducey*, 10th Dist. No. 03AP-944, 2004-Ohio-3833, ¶ 17, citing *State v. Taylor*, 66 Ohio St.3d 295, 300 (1993). " 'Reactive excited statements are considered more trustworthy than hearsay generally on the dual grounds that, first, the stimulus renders the declarant incapable of fabrication and, second, the impression on the declarant's memory at the time of the statement is still fresh and intense.' " *Id.,* quoting *Taylor*, quoting 1 Weissenberger's Ohio Evidence (1992), Section 803.16. "[The excited utterance] exception applies regardless of the declarant's availability as a witness." *McClain* at ¶ 26, citing Evid.R. 803.

{¶ 30} In *Taylor*, the Supreme Court of Ohio outlined a four-part test, derived from the common law test for admitting a "spontaneous exclamation," to determine the admissibility of hearsay as an excited utterance:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement or declaration spontaneous and unreflective, (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties, so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, (c) that the statement or declaration related to such startling occurrence or the circumstances of such startling occurrence, and (d) that the declarant had an opportunity to observe personally the matters asserted in his statement or declaration."

(Emphasis sic.) *Id.* at 300-01, quoting *Potter v. Baker*, 162 Ohio St. 488 (1955), paragraph two of the syllabus.

{¶ 31} As a general rule, "cases that invoke the excited utterance exception to the hearsay rule involve assaults, automobile accidents, and similarly impactful events." *Ducey* at ¶ 20, citing *Osborne v. Kroger Co.*, 10th Dist. No. 02AP-1422, 2003-Ohio-4368, ¶ 43. Similarly, "statements of domestic violence victims have been held to be excited utterances." *Id.*, citing *State v. Cornell*, 129 Ohio App.3d 106, 114 (10th Dist.1998).

{¶ 32} Appellant claims that the first and second prongs of the *Taylor* test were not satisfied here. Specifically, appellant asserts that S.S.'s statements were the product of reflective thought and therefore not excited utterances based upon W.-M.'s testimony that S.S. made the statements two hours after the incident and her acknowledgment that S.S. provided "pretty detailed information" about the incident and had no trouble communicating what had happened to her. We disagree with both contentions.

{¶ 33} As to the first prong of the *Taylor* test, the trial court reasonably could find that the incident with appellant was startling enough to produce in S.S. a nervous excitement sufficient to still her reflective faculties and thus render her statements the

unreflective and sincere expression of her actual impressions and beliefs. Here, the startling event for S.S. was being punched in the head and kicked in the body by her boyfriend, the father of her children, in her own home and in the presence of her four-year-old son. "An assault is a startling event." *State v. Mauldin*, 7th Dist. No. 08-MA-92, 2010-Ohio-4192, ¶ 73, citing *State v. Fields*, 8th Dist. No. 88916, 2007-Ohio-5060 at ¶ 53. S.S. had bruises on her face, chin, arms, side, and shoulder resulting from the assault. S.S. secretly fled her home in the middle of the night with her children and dog, which could indicate that she was still under the influence of the physical and emotional stress of the assault. She was crying when she arrived at M.-W.'s home and continued to cry throughout her description of the assault.

{¶ 34} Further, the trial court reasonably could conclude under the second *Taylor* prong that S.S.'s statements were made before her nervous excitement lost domination over her reflective capabilities. With excited utterances, "[t]here is no per se amount of time after which a statement can no longer be considered an excited utterance. The central requirements are that the statement must be made while the declarant is still under the stress of the event and the statement may *not* be the result of reflective thought. Therefore, the passage of time between the statement and the event is relevant but not dispositive of the question." (Emphasis sic.) *Taylor*, 66 Ohio St.3d, at 303. " 'Even when the statement is made after a substantial lapse of time, it may be admitted under the excited-utterance exception.' " *State v. Robinson*, 2d Dist. No. 28103, 2019-Ohio-2943, ¶ 20, quoting *In re S.H.W.*, 2d Dist. No. D44918, 2016-Ohio-841, ¶ 23. " 'Relevant facts in ascertaining whether the declarant was in a sufficient state of excitement or stress include outward indicia of [the declarant's] emotional state such as tone of voice, accompanying actions, and general demeanor.' " *Ducey*, 10th Dist. No. 03AP-944, 2004-Ohio-3833, at ¶ 22, quoting *Osborne*, 10th Dist. No. 02AP-1422, 2003-Ohio-4368, at ¶ 46.

{¶ 35} W.-M. testified that S.S. arrived at her home approximately two hours after the incident; she was crying and "visibly upset." W.-M. further noted that S.S. was "very frantic," "very out of it," "very nervous," and "pacing back and forth." S.S. was "still kind of pacing" and "kept crying" while reporting and demonstrating what appellant had done to her. Officer Kaethow testified that S.S. was "disheveled" and noted that she "seemed frightened, terrified" and "afraid" while describing the assault. The trial court thus

reasonably could conclude that S.S. uttered the out-of-court statements before the nervous excitement lost domination over her reflective capabilities.  *See, e.g., Ducey* at ¶ 23 (police testimony describing domestic violence/assault victim's demeanor during interview conducted  35 to 40 minutes after incident as "crying, "very upset," and "afraid" permitted trial court to conclude the victim's out-of-court statements were uttered before there had been time for such nervous excitement to lose domination over her reflective capabilities); *State v. Lash*, 8th Dist. No. 104310, 2017-Ohio-4065, ¶ 24 (affirming admission of out-of-court statement by declarant to police "hours" after observing a shooting made while still under emotional shock; declarant's demeanor at time of statement was "hysterical," "crying," and "nervous"); *State v. Phillips*, 9th Dist. No. 91CA004999 (Aug. 21, 1991) (affirming admission of felonious assault victim's out-of-court statement made at hospital "within hours" of assault; victim "extremely emotional," "crying" and "angry"); *Robinson* at ¶ 22 (affirming admission of out-of-court statement by felonious assault victim to police one and one-half hours after boyfriend assaulted her; officer testified that he "could definitely tell that [the victim] was still upset about the whole incident because she "was crying, shaking and her lips were quivering"); *State v. McCaleb*, 11th Dist. No. 2002-L-157, 2004-Ohio-5940, ¶ 44-45 (affirming admission of out-of-court statement by felonious assault victim made two hours after boyfriend beat her; victim "visibly upset," and "crying uncontrollably"); *State v. Manzell*, 5th Dist. No. 2006CA00258, 2007-Ohio-4076, ¶ 11, 14 (affirming admission of out-of-court statement by domestic violence victim to sister "a few hours" after boyfriend assaulted her; victim was "withdrawn," "crying," "wounded" and "scared" from incident at time of statement); *State v. Hoehn*, 9th Dist. No. 03CA0076-M, 2004-Ohio-1419, ¶ 21 (affirming admission of out-of-court statements by felonious assault victim to police and paramedic made within four hours after husband assaulted her; victim "scared to death, frantic, shaking," "very upset and crying [and] feared for her safety").

{¶ 36} Based upon the foregoing, we cannot find that the trial court abused its discretion by concluding that the two-hour time interval between the assault and S.S.'s recitation of the events to her sister was significant enough to render her statements the product of reflective thought, particularly given S.S.'s clandestine departure from her home with her children late at night after appellant fell asleep.  We also cannot find that S.S.'s

ability to communicate the details of the assault proved that her statements were the product of reflective thought.

{¶ 37} Lastly, under the third and fourth *Taylor* prongs, S.S.'s out-of-court statements related to the assault, and she personally observed the matters about which she spoke. The scope of S.S.'s statements was limited to the identity of appellant as the perpetrator of the assault, the events leading up to the assault, and a description of the assault itself.

{¶ 38} After careful review of appellant's arguments and the cases cited in support of those arguments, we are not persuaded that they compel the result urged by appellant given the foregoing jurisprudence, and most importantly, our deferential standard of review. Indeed, "[t]he Supreme Court of Ohio has emphasized '* * * an appellate court should allow a wide discretion in the trial court to determine whether in fact a declarant was at the time of an offered statement still under the influence of an exciting event.' " *Manzell* at ¶ 13, quoting *State v. Duncan*, 53 Ohio St.2d 215, 219 (1978).

{¶ 39} The four prongs of *Taylor* having been met, we conclude that the trial court did not abuse its discretion in admitting into evidence the hearsay testimony of M.-W. under the excited utterance exception to the hearsay rule.

{¶ 40} Next, we consider appellant's contention, asserted under his first assignment of error, that his right to a fair trial was undermined when the trial court violated his right to confrontation as guaranteed under Ohio Constitution, Article I, Section 10. Specifically, appellant asserts that the city prosecuted its case without the testimony of the victim, S.S., instead relying on the hearsay statements she made to W.-M., and that the predicate of unavailability violated state confrontation law. Questions of confrontation clause violations are reviewed under a de novo standard. *Canada,* 10th Dist. No. 14AP-523, 2015-Ohio-2167, at ¶ 45, citing *State v. Durdin*, 10th Dist. No. 14AP-249, 2014-Ohio-5759, ¶ 15. "De novo review is independent, without deference to the lower court's decision." *State v. Hudson*, 3d Dist. No. 9-12-38, 2013-Ohio-647, ¶ 27.

{¶ 41} The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." *State v. O.A.B.*, 10th Dist. No. 18AP-384, 2020-Ohio-547, ¶ 44. "The Confrontation Clause bars 'admission of testimonial

statements of a witness who did not appear at trial unless he was unavailable to testify and the defendant had had a prior opportunity for cross-examination.' " *State v. Hubbard*, 10th Dist. No. 11AP-945, 2013-Ohio-2735, ¶ 29, quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). "Thus, if the hearsay evidence sought to be admitted comprises testimony from an absent witness, who cannot be cross-examined or observed face-to-face by the trier of fact, the Confrontation Clause limits the admission of that hearsay evidence." *Id.,* citing *State v. Keairns*, 9 Ohio St.3d 228, 229 (1984).

{¶ 42} However, "[t]he Confrontation Clause does not apply to nontestimonial hearsay." *Id.*, citing *State v. Cassell*, 10th Dist. No. 08AP-1093, 2010-Ohio-1881, ¶ 24, citing *Crawford* at 68; *McClain*, 10th Dist. No. 13AP-347, 2014-Ohio-93, at ¶ 16, citing *Crawford* at 68. The Supreme Court of Ohio has adopted the "objective-witness test" for evaluating "out-of-court statements made to a person who is not law enforcement." *State v. Jones*, 135 Ohio St.3d 10, 2012-Ohio-5677, ¶ 161. Such statements are testimonial for Confrontation Clause purposes if made "under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, paragraph one of the syllabus, cited with approval in *Jones* at ¶ 161. The focus is "on the expectation of the declarant at the time of making the statement." *Id.* at paragraph two of the syllabus.

{¶ 43} The Supreme Court of Ohio, applying the objective-witness test, has concluded that statements made to persons who are not law enforcement about the cause of an injury or reasons for emotional upset are generally nontestimonial and do not implicate the federal Confrontation Clause. For example, in *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, the court found that the statement of the defendant's daughter to the victim's niece about the defendant's previous act of choking the declarant's mother was nontestimonial for Confrontation Clause purposes. *Id.* at ¶ 182, 185. In *State v. Beasley*, 153 Ohio St.3d 497, 2018-Ohio-493, the court determined that the declaration of a victim to a stranger that the defendant shot him was nontestimonial. *Id.* at ¶ 182. The stranger testified to the victim's statements at trial. *Id.* at ¶ 179. The court stated, "[a] truly excited utterance is unlikely ever to meet [the objective-witness] standard; certainly an objective observer would not believe that when Davis [a shooting victim], scared, bleeding, and in shock, sought help from strangers, he expected his statements to be available for use

at trial." *Id.* at ¶ 182. Likewise, in *Jones,* the court found that the declaration of a wife to her friend that her husband killed a woman was nontestimonial. *Id.* at ¶ 135, 162, 164. The wife did not testify at her husband's murder trial based on spousal privilege. *Id.* at ¶ 119. However, the friend testified as to what the wife told her. *Id.* at ¶ 132. The court found no Confrontation Clause violation, reasoning that an objective witness reasonably would not believe that the wife's statements to her friend while in an emotional state, repeating what her husband had told her, would be available for use at a later trial. *Id.* at ¶ 162. The court noted that the wife did not call the police until after she told her friend what her husband had told her. *Id.*

{¶ 44} Other Ohio appellate courts have held similarly. *See, e.g.*, *State v. Peeples*, 7th Dist. No. 07 MA 212, 2009-Ohio-1198, ¶ 28-31 (holding that assault victim's statement to a friend that the defendant "beat her up real bad" and injured her was nontestimonial because an objective witness reasonably would not believe that the statement would later be used at trial); *State v. Zadar*, 8th Dist. No. 94698, 2011-Ohio-1060, ¶ 34-38 (holding that murder victim's statements to a friend and therapist about her fear of the defendant's rages and outbursts and her belief that he was going to kill her were nontestimonial under the "objective witness" test because an objective witness under the same circumstances would reasonably not have believed her statements would be used later for trial).

{¶ 45} In the present case, S.S.'s statements to W.-M. were nontestimonial, as the circumstances under which S.S. provided the statements would not lead an objective observer to expect that her statements would be available for use at a later trial. S.S. made the statements to her sister immediately after arriving at her home. W.-M.'s testimony does not establish, or even suggest, that she and S.S. discussed the possibility of S.S. providing testimony about appellant's actions at a later trial. Further, S.S. made the statements prior to W.-M.'s decision to call the police.

{¶ 46} Appellant maintains that even if admission of the statements did not violate his federal confrontation rights, admission of the statements violated his confrontation rights under Ohio Constitution, Article I, Section 10, which, appellant argues, affords greater rights of confrontation than under the Sixth Amendment to the United States Constitution. Ohio Constitution, Article I, Section 10, provides in part: "In any trial, in any court, the party accused shall be allowed to * * * meet the witnesses face to face." *O.A.B.,*

10th Dist. No. 18AP-384, 2020-Ohio-547, at ¶ 49. In support, appellant relies primarily on *State v. Storch*, 66 Ohio St.3d 280 (1993).

{¶ 47} In *O.A.B.*, this court considered and rejected an identical argument. There, a young child told the school nurse that her father had "chokeslammed" her. *Id.* at ¶ 4. At the defendant's subsequent trial, the state did not call the child to testify; rather, it relied on her hearsay statements made to the school nurse. The statements were admitted under Evid.R. 803(4), which provides a hearsay exception for statements made for purposes of medical diagnosis or treatment. Following his convictions for domestic violence, assault, and endangering children, the defendant argued that Ohio has interpreted its constitution to confer greater confrontation rights to their citizens as compared to the federal constitution, and that the predicate of unavailability violated state confrontation law.

{¶ 48} In support of his argument, the defendant relied principally on *Storch.* At the outset, this court noted the *Storch* court's holding that " 'Evid.R. 807 accords with the right of confrontation guaranteed by both Section 10, Article I of the Ohio Constitution and the Sixth Amendment to the Constitution of the United States.' " *O.A.B.* at ¶ 50, quoting *Storch* at paragraph one of the syllabus. We also observed its further holding that " '[w]e believe the live testimony of a child who has claimed abuse will in most cases enhance the reliability of the fact-finding process.' " *Id.*, quoting *Storch* at 292.

{¶ 49} This court found unpersuasive the defendant's contention, in the context of the admission of nontestimonial statements under Evid.R. 803(4), that the Ohio Constitution provides more protection than the Sixth Amendment right of confrontation. In so finding, we relied on the holding in *State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742 which, in turn, quoted *State v. Self*, 56 Ohio St.3d 73 (1990) for the proposition that in cases admitting hearsay under Evid.R. 803(4), " ' "Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment." ' " *O.A.B.* at ¶ 51, citing *Arnold* at ¶ 12, quoting *Self* at 79. We further noted other Ohio appellate decisions holding in accord. *Id.*, citing *State v. Williams*, 6th Dist. No. L-11-1084, 2013-Ohio-726, ¶ 21 (finding *Arnold's* conclusion that the Ohio Constitution affords no greater right of confrontation than that afforded under the Sixth Amendment with regard to Evid.R. 803(4) consistent with its analysis in *State v. Johnson*, 6th Dist. No. L-05-1001, 2006-Ohio-1232, both with respect to statements for purposes of medical diagnosis and

treatment as well as statements that constitute excited utterances), and *State v. Carter*, 7th Dist. No. 15 MA 0225, 2017-Ohio-7501, ¶ 41-42 (noting that *Storch* was decided more than a decade before *Crawford,* and that *Arnold* (decided after *Storch*) reiterated the Supreme Court of Ohio's holding that Ohio Constitution, Article I, Section 10, provides no greater right of confrontation than the Sixth Amendment). In addition, we observed that this court and others "have found the holding in *Storch*, involving the admission of statements under Evid.R. 807, inapplicable to cases involving statements properly admitted into evidence under Evid.R. 803(4)." *O.A.B.* at ¶ 52, citing *State v. Edinger*, 10th Dist. No. 05AP-31, 2006-Ohio-1527, ¶ 83-84 (declining to extend *Storch* to a case where out-of-court statements were properly admitted under Evid.R. 803(4)); *State v. Brown*, 5th Dist. No. CA-9543 (Aug. 22, 1994).

{¶ **50**} While *Edinger* involved the admission of hearsay statements under Evid.R. 803(4), we cited in support the decisions of other Ohio courts considering the admission of hearsay statements under Evid.R. 803(2). Those courts refused to extend the *Storch* holding beyond the Evid.R. 807 context. *See State v. Johnson*, 4th Dist. No. 94 CA 2004, 1995 Ohio App. LEXIS 5845 (Dec. 26, 1995) (because the statements in *Storch* regarding the Ohio Confrontation Clause were dicta, the court refused to impose an availability requirement on firmly rooted hearsay exceptions such as excited utterances); *State v. Wright*, 8th Dist. No. 71008, 1997 Ohio App. LEXIS 4507 (Oct. 2, 1997) (trial court was not required to inquire into availability of the child-declarant to testify because the child's testimony was admitted under the excited utterance exception under Evid.R. 803(2)).

{¶ **51**} As we recognized in *O.A.B.*, the Sixth District Court of Appeals has declined to apply *Storch* in the context of Evid.R. 803(2). Specifically, in *Johnson*, 6th Dist. No. L-05-1001, 2006-Ohio-1232, the court stated that "the central holdings of the *Storch* court revolved around Evid.R. 807." *Id.* at ¶ 27. Following this statement, the court discussed two of the cases appellant cites in the present case to support his argument that *Storch* compels a finding that his state confrontation rights were violated. Specifically, the court noted that it had followed *Storch* in *State v. McWhite*, 91 Ohio App.3d 508 (6th Dist.1993) and *State v. Ulis*, 61 Ohio St.3d 656 (6th Dist.1993), cases in which the child victims were found incompetent to testify and their hearsay statements were admitted pursuant to Evid.R. 803(4) through the testimony of a psychologist. *Id.* at ¶ 28. The *Johnson* court

noted the "broad language" used in those cases, i.e., that the failure to first demonstrate the child declarant's incompetency before admitting hearsay statements violated the defendant's right of confrontation as set forth in the Ohio Constitution. *Id.* at ¶ 29-30, citing *McWhite* at 513, and *Ulis* at 667. The court declined to extend *Storch* and its *Storch*-based holdings in *McWhite* and *Ulis* to the cause before it.

{¶ 52} The *Johnson* court reasoned that the outcome of those cases rested upon the failure of the trial courts to determine the competency of a child declarant. In contrast, the declarants in the case before it were adults whose competency was not challenged and whose statements were admitted into evidence as firmly rooted hearsay exceptions, i.e., excited utterances. The court further noted its decision in *In re James W.*, 6th Dist. No. E-96-051 (May 16, 1997), wherein it found that "unlike hearsay permitted under Evid.R. 807, the Confrontation Clause is automatically satisfied when hearsay evidence is presented under the auspices of Evid.R. 803(2) or 803(4); therefore, 'the issue of the declarant's availability is irrelevant * * *.' " *Johnson* at ¶ 30, quoting *In re James W.* The *Johnson* court also noted the Second District Court of Appeals' decision in *State v. Williams*, 2d Dist. No. 20368, 2005-Ohio-213, which found that "excited utterances are not violative of Section 10, Article I, Ohio Constitution because they fit the exceptional circumstances of trustworthiness 'for their admission without regard to the availability of the declarant as a witness.' " *Id.*, quoting *Williams* at ¶ 17 and 18.

{¶ 53} Based on the foregoing, we decline appellant's invitation to extend *Storch* to the instant case. S.S.'s statements were nontestimonial, made to an adult whose competency was not challenged, and qualified as excited utterances under Evid.R. 803(2). Accordingly, appellant has failed to demonstrate that the trial court erred in admitting such statements in violation of his right to confrontation under the Sixth Amendment to the United States or Ohio Constitution, Article I, Section 10.

{¶ 54} Lastly, we examine appellant's final contention related to S.S.'s absence from trial, raised under his third assignment of error, that the trial court erred in denying his request for a continuance to secure S.S.'s appearance. Appellant maintains that the trial court's decision resulted in a denial of his right to present a defense, as S.S. would have offered testimony both impeaching W.-M. and exculpating appellant. The abuse of discretion standard of review applies to rulings related to the denial of a continuance. *State*

*v. Abdalla*, 10th Dist. No. 01AP-439 (Dec. 18, 2001), citing *State v. Unger*, 67 Ohio St.2d 65, 67 (1981).

{¶ 55} In *Unger*, the Supreme Court of Ohio observed that " '[t]here are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly in the reasons presented to the trial judge at the time the request is denied.' " *Id.* at 67, quoting *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).

{¶ 56} Review of a trial court's exercise of discretion in ruling on a request for a continuance requires an appellate court to weigh any potential prejudice to the defendant against a court's right to control its own docket and the public's interest in the prompt and efficient dispatch of justice. *Id.* When evaluating a request for a continuance, a court should consider, among other factors, "the length of delay requested; whether other continuances have been requested and received; the inconvenience to litigants, witnesses, opposing counsel and the court; whether the requested delay is for legitimate reasons or whether it is dilatory, purposeful, or contrived; whether the defendant contributed to the circumstance which gives rise to the request for a continuance; and other relevant factors, depending on the unique facts of each case." *Id.* at 67-68.

{¶ 57} Upon careful examination of the record, we cannot conclude that the trial court abused its discretion in denying appellant's request for a continuance. First, defense counsel did not specify the proposed length of the continuance. *See State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, ¶ 48. *See also State v. Woods*, 10th Dist. No. 09AP-667, 2010-Ohio-1586, ¶ 27 (trial court could consider that defendant was unable to specify the length of delay he needed to procure police officer's appearance); *State v. Alexander*, 10th Dist. No. 94APA04-593 (Mar. 14, 1995) (concluding the trial court did not abuse its discretion in overruling defendant's request for an indefinite continuance); *Columbus v. Catudel*, 10th Dist. No. 18AP-229, 2019-Ohio-1137, ¶ 11. Here, the trial court expressly considered the lack of specificity regarding the proposed length of the continuance: "You want to say * * * that she can be here at some other time, but you're not telling me when." (Jan. 30, 2019 Tr. at 95.) Further, S.S.'s failure to comply with the city's subpoena arguably suggests that she would not appear at trial even if a continuance were granted. Indeed, the

trial court found defense counsel's assertion that S.S. would appear for trial unavailing: "[t]here doesn't seem to be any indicator that there's any real truth to that." *Id.*

{¶ 58} Moreover, although defense counsel alleged that S.S. would provide testimony both impeaching W.-M. and exculpating appellant, he did not proffer any summary of S.S.'s anticipated testimony. " 'When the reason for a continuance is to secure the attendance of a witness, "it is incumbent upon the moving party to show that such witnesses would have given substantial favorable evidence and that they were available and willing to testify." ' " *State v. Presar*, 10th Dist. No. 09AP-122, 2009-Ohio-5127, ¶ 10, quoting *State v. Komadina*, 9th Dist. No. 02CA008104, 2003-Ohio-1800, ¶ 32, quoting *State v. Mills*, 5th Dist. No. 01-COA-01444, 2002-Ohio-5556. Because defense counsel did not make a timely proffer of S.S.'s anticipated testimony, the trial court could not have known how or why her testimony was vital to appellant's defense when it denied the continuance. *Id.* at ¶ 11, citing *State v. Snowden*, 49 Ohio App.2d 7, 17 (12th Dist.1976).

{¶ 59} Appellant contends that the prosecutor's statement regarding his reluctance to put on the record "something" he had been told in regard to S.S.'s failure to comply with the city's subpoena suggests that the prosecutor was aware of the nature of the impeachment/exculpatory testimony S.S. was going to provide. We disagree, as on this record, we have no way of knowing what the prosecutor's "something" comment referenced. Further, the city's supposed knowledge of the anticipated testimony did not obviate defense counsel's duty to proffer the anticipated testimony to the trial court for evaluation regarding the necessity for a continuance. Finally, to the extent appellant contends that S.S. would have provided exculpatory testimony, we note that appellant testified as to his version of the incident.

{¶ 60} Also weighing against the requested continuance was the fact that S.S.'s failure to appear on behalf of appellant was occasioned in part by appellant's own trial tactics. As previously mentioned, trial was continued from December 13, 2018 to January 29, 2019 at the city's request. Appellant had ample time to subpoena S.S. during this six-week period but failed to do so. As noted by the city, this court has concluded that a trial court does not abuse its discretion in denying a requested continuance to obtain witness testimony when counsel fails to subpoena the witness. *State v. Clark*, 10th Dist. No. 01AP-670 (Dec. 11, 2001); *State v. Wyke*, 10th Dist. No. 98AP-1084 (Sept. 21, 1999)

(no abuse of discretion in denying defendant's mid-trial request for continuance where his failure to subpoena witness contributed to his need for a continuance). Although the cited cases did not involve witnesses already under subpoena by the prosecution, we find that distinction irrelevant. A defendant relies on a prosecution subpoena at his or her own peril, as the prosecution ultimately may choose not to call its subpoenaed witness as part of its case, or, as in this case, the witness may choose to ignore that subpoena.

{¶ 61} Further, defense counsel argued that he had no advance knowledge that S.S. would need to testify on behalf of appellant because W.-M. had not previously been subpoenaed, and he became aware that she was going to testify only the day before trial. The prosecutor pointed out that defense counsel's failure to file a request for discovery eliminated the city's obligation to identify W.-M. as a witness. The trial court recognized that defense counsel's strategy in failing to request discovery ultimately did not work to his advantage.

{¶ 62} In addition, the trial court was unpersuaded by defense counsel's argument that S.S.'s failure to appear resulted from the subpoena being sent to her former Columbus address rather than her current address in Cleveland. The court noted that it was S.S.'s burden to apprise the city of her current address. The court further found that the defense had provided no evidence that S.S. had not received the subpoena.

{¶ 63} In the final analysis, we cannot conclude that the trial court abused its discretion in refusing to grant appellant's request for a continuance. Rather than summarily denying the request, the trial court engaged in a lengthy discussion with defense counsel and carefully considered the arguments advanced before issuing its ruling. Further, and perhaps most importantly, the trial court indicated that it would grant a brief continuance to procure S.S.'s attendance that afternoon if defense counsel could provide assurances that she would appear. The trial court's refusal to accept defense counsel's contentions regarding S.S.'s purported inability to appear that day due to transportation issues was not unreasonable under the circumstances of this case.

{¶ 64} For all the foregoing reasons, appellant's first, second, and third assignments of error are overruled.

{¶ 65} In his fourth assignment of error, appellant asserts his convictions for assault and domestic violence are against the manifest weight of the evidence. Because the trial

court did not abuse its discretion in admitting S.S.'s out-of-court statements into evidence, we consider that evidence, as well as the testimony provided by the city's witnesses and appellant, in assessing the manifest weight of the evidence.

{¶ 66} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether the factfinder's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. *Ducey*, 10th Dist No. 03AP-944, 2004-Ohio-3833, at ¶ 30, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). We review " 'the entire record, weigh[] the evidence and all reasonable inferences, consider[] the credibility of witnesses and determine[] whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.' " *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). "Determinations of credibility and weight of the testimony remain within the province of the trier of fact." *Ducey* at ¶ 30, citing *State v. DeHass,* 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. " 'The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.' " *Thompkins* at 386, quoting *Martin* at 175.

{¶ 67} Appellant was convicted of assault pursuant to R.C. 2903.13(A), which prohibits persons from knowingly causing, or attempting to cause, physical harm to another. A person acts "knowingly," regardless of purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. R.C. 2901.22(B). "Physical harm" to a person means any injury, regardless of its gravity or duration. R.C. 2901.01(A)(3).

{¶ 68} Appellant was also convicted of domestic violence in violation of R.C. 2919.25(A), which proscribes knowingly causing or attempting to cause physical harm to a family or household member. The statute further defines a "family or household member" as "a person living as a spouse," which means "a person who is living or has lived with the offender in a common law marital relationship, who otherwise is cohabiting with the offender, or who otherwise has cohabited with the offender within five years prior to the date of the alleged commission of the act in question." R.C. 2919.25(F)(1)(a)(i), (2). "Family or household member" also includes "the natural parent of any child of whom the

offender is the other natural parent or is the putative other natural parent." R.C. 2919.25(F)(1)(b). It is undisputed that S.S. is a "family or household member" for purposes of the domestic violence statute.

{¶ 69} Appellant claims that he grabbed S.S.'s arms and pushed her into a wall and then onto their bed after she punched and scratched him in the face. Thus, appellant's claim is one of self-defense. At the time the offenses were committed, self-defense was an affirmative defense for which appellant bore the burden of proof at trial. Former R.C. 2901.05.[2] To establish self-defense, appellant must demonstrate: "(1) he was not at fault in creating the situation giving rise to the assault; (2) he had a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was by the use of force; and (3) he must not have violated any duty to retreat or avoid the danger." *State v. Reynolds*, 10th Dist. No. 03AP-701, 2004-Ohio-3692, ¶ 15, citing *State v. Robbins*, 58 Ohio St.2d 74 (1979). "These three elements are cumulative; if appellant fails to prove any one of the elements by a preponderance of the evidence, then self-defense has not been demonstrated." *Id.*, citing *State v. Jackson*, 22 Ohio St.3d 281 (1986).

{¶ 70} While appellant's testimony that S.S. attacked him arguably establishes the first prong of his self-defense claim, other portions of his testimony negate the second prong. Indeed, appellant testified that he told the 911 operator that he was not afraid for his safety during the altercation with S.S., and he reiterated that statement at trial. Thus, appellant's own testimony establishes that he did not have a bona fide belief that he was in imminent danger of great bodily harm and that his only means of escape from such danger was by the use of force. Appellant's failure to prove the second element of his self-defense claim by a preponderance of the evidence dooms his claim.

{¶ 71} Moreover, with regard to credibility issues, the trial court expressly stated that W.-M. "came across as credible." Tr. at 104. The court specifically rejected defense counsel's challenge to W.-M.'s credibility based on grounds that she had a preconceived notion of what she believed had happened at the moment S.S. arrived at her door. To that

---

[2] The current version of R.C. 2901.05, effective March 28, 2019, places the burden on the prosecution to prove the accused did not use force in self-defense. This court has held that the changes to R.C. 2901.05 do not apply retroactively. *State v. Zafar*, 10th Dist. No. 19AP-255, 2020-Ohio-3341, ¶ 31, citing *State v. Ward*, 10th Dist. No. 19AP-266, 2020-Ohio-465, ¶ 15. Accordingly, because appellant committed the offense and his trial occurred prior to the effective date of the amendment, he was not entitled to the burden-shifting changes made to R.C. 2901.05.

end, the court noted that W.-M. observed S.S.'s demeanor and physical condition and came to the conclusion that S.S. had been assaulted. The trial court further pointed to W.-M.'s testimony regarding what S.S. told her, finding that "she relayed exactly what she saw and was told to her." *Id.* at 107. In addition to W.-M.'s testimony, the court noted the testimony offered by the police and the photographs taken by both W.-M. and the police, which corroborated the testimony about S.S.'s physical injuries.

{¶ 72} As to appellant's credibility, the trial court expressly stated: "I don't find the defendant's testimony and explanation of the series of events to be credible." *Id.* The court specifically found that appellant made the 911 call "as a means to cover himself because he knew what was coming. * * * He knew when she left the house that this was potential trouble for him, and he was going to try and head it off [at the] pass by making a call to 911 and lay down his version of events so that it would leave him * * * some sort of a defense down the road. And I just don't find that to be credible." *Id.* at 106.

{¶ 73} As noted above, credibility determinations are within the province of the trier of fact. *Ducey*, 10th Dist. No. 03AP-944, 2004-Ohio-3833, at ¶ 30. Here, the trial court expressly stated that it did not believe appellant's version of the events, and that W.-M.'s testimony regarding what S.S. told her was credible. "[A] conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of the evidence over the defendant's version." *State v. Lipkins*, 10th Dist. No. 16AP-616, 2017-Ohio-4085, ¶ 39, citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523, ¶ 19.

{¶ 74} In sum, with the excited utterance evidence presented through W.-M.'s testimony, the trial court, despite appellant's contrary version of the events, could find beyond a reasonable doubt that appellant committed the offenses with which he was charged. The manifest weight of the evidence supports the trial court's verdict.

{¶ 75} Accordingly, appellant's fourth assignment is overruled.

{¶ 76} Having overruled appellant's first, second, third, and fourth assignments of error, we hereby affirm the judgment of the Franklin County Municipal Court.

*Judgment affirmed.*

DORRIAN, P.J., concurs.
NELSON, J., dissents.

NELSON, J., dissenting.

{¶ 77} Domestic violence is repugnant and should be punished under the law as appropriate. But to the extent that Ohio courts have said that the right of a criminal defendant to meet accusers "face to face," *see* Ohio Constitution, Article I, Section 10, must give way to "firmly rooted" hearsay exceptions at least where the accusatory declarations repeated by another are deemed "nontestimonial," *see supra* at ¶ 52-53, then stretching those hearsay exceptions even in the cause of combatting domestic violence threatens to undermine protections against conviction by word of mouth that I might have thought fundamental to our State's adversarial system of justice. Because broadening the "excited utterance" exception past the point of the safeguards for veracity that the exception was designed to incorporate will work too frequently to shield direct witnesses from the "crucible of cross-examination" on which our system of criminal trials depends, *compare Crawford,* 541 U.S. at 61, I very respectfully dissent.

{¶ 78} Although I do not share the City's view as expressed during oral argument that the meaning of Ohio's "face to face" protection inexorably changes with and is at the mercy of federal courts' interpretations of the (different) federal confrontation clause, I recognize that our Supreme Court has said that " 'Section 10, Article I [of the Ohio Constitution] provides no greater right of confrontation than the Sixth Amendment' " (at least as the Sixth Amendment was construed in 2010 or 2016). *See Arnold* at ¶ 12 (citation omitted); *State v. McKelton*, 148 Ohio St.3d 261, 2016-Ohio-5735, ¶ 170, fn. 8.; *compare generally In re S.M.B.*, 10th Dist. No. 17AP-899, 2019-Ohio-3578, ¶ 94-109 (Nelson, J., dissenting in part, tracing some of the evolution of the Supreme Court of Ohio analysis and concluding "it seems likely to me that *Storch* no longer provides authority for the proposition that Ohio's Constitution ensures greater confrontation clause rights than does the federal constitution as understood at the time of those [*Arnold*-type] decisions, at least with regard to firmly rooted hearsay exceptions").

{¶ 79} As others have noted, that state of our constitutional law makes careful adherence to the limits of the "excited utterance" exception from the ban on hearsay testimony all the more consequential. "Whenever the prosecution offers hearsay evidence in a criminal case, the accused's Sixth Amendment right to confront his accusers is directly implicated. Hearsay exceptions should be narrowly construed by the trial court when the

constitutional rights of the accused are directly affected by the admission of the hearsay testimony." *State v. Haar*, 158 Ohio App.3d 704, 2004-Ohio-5771, ¶ 140 (2d Dist.) (finding that trial court abused its discretion by stretching excited utterance exception, and that "[t]he error was not 'harmless' because the hearsay statements were virtually the only evidence presented by the State to support the charge"). *See also State v. Matthews*, 2d Dist. No. 24233, 2011-Ohio-5066, ¶ 66 (same, quoting *Haar*, and noting that the hearsay "statements were merely narrative accounts of what Matthews did to her, and she was understandably upset by the events. The situation here does not support finding that [declarant] was sufficiently under the influence of a nervous excitement to constitute an excited utterance.").

{¶ 80} Here (and the majority's description of the circumstances is very fair), the sister who actually testified was not in a position to give the precise time lag between the events that gave rise to the charge and her sister's recounting of them to her: "I assumed that it might -- From [the] history, I assumed that it had been a couple hours." Tr. at 27. We do know, in any event, that during that interval, the teller of the narrative (1) waited until C.G. had fallen asleep, when (2) "she was able to grab the kids * * * and the dog" and (3) undertake the roughly 30-minute drive to her sister's residence. Tr. at 32, 39. Once there, as the majority carefully notes, she "had no trouble communicating what had happened to her and provided 'pretty detailed information' about the incident." *Supra* at ¶ 7, quoting Tr. at 44. Her narrative included reflections on the need to end the relationship with C.G.: "[S]he kept saying how stupid she was. She kept crying. She said she has to get out of this situation for her kid * * *." Tr. at 31-32.

{¶ 81} But narrative statements repeated as hearsay do not generally qualify for the excited utterance exception. We've recognized that before: "statements are beyond the exception when they are more like a narrative of past events than an exclamation." *State v. Minturn*, 10th Dist. No. 94APA04-532, 1994 Ohio App. Lexis 5831, *9 (citation omitted) (adding at *10 that the declarant's "detailed statements clearly amounted to a reflective narrative beyond the purview of the excited utterance exception. As such, the trial court erred in allowing its admission"); *compare Matthews* at ¶ 66 ("merely narrative accounts" do not qualify for exception).

{¶ 82} That is because, as the Supreme Court of Ohio has explained, the excited utterance exception " 'derives its guarantee of trustworthiness from the fact the declarant is under such state of emotional shock *that his reflective processes have been stilled. Therefore, statements made under these circumstances are not likely to be fabricated.*' " *Taylor*, 66 Ohio St.3d at 300 (emphasis in original), referencing McCormick's *Handbook of the Law of Evidence*, Section 297, 2d Ed. (1972). Hence, "an excited utterance must be the product of reactive rather than reflective thinking: 'Reactive excited statements are considered more trustworthy than hearsay generally on * * * grounds that, first, the stimulus renders the declarant incapable of fabrication * * *.' " *Id.*, quoting 1 Weissenberger's Ohio Evidence, Section 803.16 (1992) (further citation omitted).

{¶ 83} Thus, "[m]erely being 'upset' does not meet the standard for admissibility under Evid. R. 803(2) because it does not show that [declarant's] statements were not the result of reflective thought." *Id.* at 303 (also noting that the hearsay account of the declarant's statements there "indicates just the opposite: that [declarant] was reflecting on the event and giving a narrative account * * * which was the result of his reflective thought."). We've acknowledged that point, too, in the past, observing that *Taylor*'s admonition is "unequivocal[]." *State v. Bowles*, 10th Dist. No. 97APA09-1213, 1998 Ohio App. Lexis 1889, *15 (Apr. 28, 1998). In *Bowles*, while the error was harmless, we found that where "the testimony * * * constituted narrative hearsay accounts beyond the purview of the excited utterance exception," the trial court had erred by admitting it. *Id.* at *15-16.

{¶ 84} The majority concludes that waiting until an assailant falls asleep before collecting children (and a dog) and then driving half an hour in the night "could indicate" a lack of reflective thought. *Supra* at ¶ 33, 36 (no abuse of discretion in finding nothing "significant enough to render her statements the product of reflective thought, particularly given [her] clandestine departure from her home with her children late at night after appellant fell asleep"). I would say quite the opposite: the thinking as conveyed was brave, admirable, and (appropriately well) considered. *Compare* Dictionary.com (defining "clandestine" as "characterized by, done in, or executed with secrecy or concealment, especially for purposes of subversion or deception * * *"). And the account provided to the testifying sister was indeed narrative and not simply exclamatory (to use our term from *Minturn*) or reactive. *See, e.g., supra* at ¶ 7 (" 'pretty detailed' " and effectively

communicated); Tr. at 30 ("She * * * said she doesn't know why he thinks or understands that she's had these communications [with another man] when there's nothing in her phone and that she found that he has been tracking her"), 31-33 (expressing need to get out of relationship, providing further account of episode, and apparently explaining that she hadn't been able to call during her drive or earlier because C.G. "had her phone").

{¶ 85} The authorities marshaled by the majority tend, I think, to underscore why the facts of this case do not suggest appropriate extension of the excited utterance exception for hearsay. This is not like *Ducey*, where the victim was interviewed at the scene within 35 to 40 minutes of the incident. 2004-Ohio-3833, at ¶ 23. It certainly is not like *Lash*, where one, eight-word phrase was at issue and its declarant was subject to examination by both sides at trial. 2017-Ohio-4065, at ¶ 18, 25. In *Robinson*, the declarant again was subject to cross-examination (and I am not sure that we want to adopt the "re-excitement" theory employed by a trial court from another district). *Compare* 2019-Ohio-2943, at ¶ 4, 24. *McCaleb* yet again involved very different facts and a declarant who testified (and therefore was subject to cross-examination) at trial. 2004-Ohio-5940, at ¶ 10. In *Hoehn*, too, the declarant testified at trial, 2004-Ohio-1419, at ¶ 28, and *Manzell* involved a roughly five-word declaration by a victim who "testified on behalf of the state, claiming appellant had caused her injuries," 2007-Ohio-4076, at ¶ 3, 11. Suffice it to say that those facts are not these.

{¶ 86} A somewhat more analogous case may be *State v. Dengg*, 11th Dist. No. 2008-P-0063, 2009-Ohio-4101. There, the court of appeals found that "[t]he trial court abused its discretion by admitting * * * [hearsay] evidence, as it was not an excited utterance." *Id.* at ¶ 61. The declarant's "statement to the police was clearly the result of reflective thought. She made a concerted effort to go to the police station and fill out the report." *Id.* at ¶ 59 (reiterating at ¶ 60 that " 'merely being "upset," without more, does not meet the standard of admissibility under Evid.R. 803(2)' ") (citations omitted).

{¶ 87} But I am more influenced by *Taylor*, authority from the Supreme Court of Ohio. There, the Supreme Court judged "[t]he evidence * * * insufficient to find" the declarant's statements the product of an excited utterance "rather than that the statements were the narrative result of reflective thought." 66 Ohio St.3d at 305. Like the Court there, I "cannot say that the decision of the trial court to admit the disputed testimony was

reasonable," *id.*; finding it an abuse of discretion, I would sustain C.G.'s second assignment of error in that allowing the hearsay testimony absent an applicable exception violated Evid.R. 802.

**{¶ 88}** I therefore would not reach the moot question of whether under these circumstances, the trial court should have tried to accommodate C.G.'s request that the direct witness/victim be given more time to appear at trial (with purportedly exculpatory testimony of some sort, *see supra* at ¶ 21). I would attach no legal significance, then, to the prosecutor's remark that in the direct witness's last communication with the state, "we were told something that, I guess, I would prefer not to share on the record." *See supra* at ¶ 22, citing Tr. at 53.

**{¶ 89}** I do return, however, to the prosecutor's closing argument that:

> The credibility determination that the Court really has to make is whether [the absent direct witness/victim] is more credible than the declarant or whether the defendant is more credible. And, true, [she] has not shown up today for whatever reason. However, the testimony about what [she] said is important because she said it while she was upset right after an incident occurred while -- after having fled from the defendant.

Tr. at 99-100.

**{¶ 90}** The trial court was not well positioned to assess the credibility of a witness who did not appear and whose account, therefore, could not be tested through any sort of cross-examination. The trial court had "no reason to doubt the testimony" of the sister, who "came across as credible." But she wasn't at the event, and wasn't the person levelling the accusations. (When the trial court said that in weighing the evidence, "you have the testimony of the prosecuting witness," Tr. at 105, it did not use the phrase "prosecuting witness" in the "more particular sense" described by the old Black's Law Dictionary to indicate "the person who was chiefly injured, in person or property, by the act constituting the alleged crime * * * and who instigates the prosecution and gives evidence." *See* Black's Law Dictionary, 5th Ed. (1979).)

**{¶ 91}** The trial court's capacious understanding of the excited utterance exception meant (or maybe more precisely, and maybe more significantly, could mean in many more future cases) that the direct witness could be shielded entirely from the cross-examination

process so vital to our justice system, even absent veracity guarantee requirements for the exception as historically understood.

{¶ 92} If the excited utterance exception to the rule against hearsay is not confined to those circumstances that really provide a " 'guaranty of trustworthiness' " by " 'render[ing] the declarant incapable of fabrication' " -- if it is to be expanded, that is, beyond those circumstances in which a declarant's " '*reflective processes have been stilled*,' " -- *Taylor*, 66 Ohio St.3d at 305 (emphasis in original; citations omitted), the proffering of testimony through another not directly familiar with the events in question (and therefore not susceptible to various meaningful lines of cross-examination) may increasingly be deemed expedient.  Especially in the context of our criminal law, with lives and liberty on the line, I do not find that a prospect we should encourage.  In my view, this case stretches the excited utterance hearsay exception past the breaking point.

{¶ 93} Therefore, and despite the majority's careful analysis and recitations, I very respectfully dissent.

_____